IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: AIG WORKERS COMPENSATION  ) | | |
| INSURANCE POLICYHOLDER LITIGATION,  ) | Case No. 14 C 2529 | |
| ) | | |
| **This relates to: All Actions**,  ) | MDL No: 2519 | |
| ) | | |
| ) | Judge Robert W. Gettleman | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Beach Medical Marketing, Inc., D&J Plastics, Inc., Franjo, Inc., Hopson Seal-a-Lot, Inc., Jayarvee, Inc., JPS Collision, Inc., Mesa Cycles, Inc., Patrick Purdy, Inc., Philip J. Feitelson PSC and tmg-emedia, Inc. have brought a six count consolidated amended class action complaint against defendants American International Group, Inc., AIU Insurance Company, American Home Assurance Company, American Fuji Fire and Marine Insurance Company, American International Overseas Limited, Chartis Property Casualty Company, Commerce and Industry Insurance Company, Granite State Insurance Company, Illinois National Insurance Co., Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company, Yosemite Insurance Company, AIG Risk Management, Inc., and Maurice R. Greenberg, former Chairman and CEO of AIG (jointly "AIG"), alleging violations of the Racketeer Influence and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c), (d), common law fraud, negligent misrepresentation, unjust enrichment, and violations of various state consumer protection acts. Defendants have filed motions[1] to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, arguing that all of plaintiffs'

---

[1] All of the AIG entities have filed a joint motion to dismiss. Greenberg has joined in that motion and filed a separate supplemental motion adopting the arguments in the AIG motion and adding an argument that by resigning in 2005 he withdrew from any alleged conspiracy.

claims are barred by the applicable statutes of limitations. For the reasons stated below, the motions are granted.

## BACKGROUND

Despite the considerable detail in their 134 page, 474 paragraph Consolidated Amended Class Action Complaint ("CAC"), plaintiffs' theory is really quite simple. Plaintiffs are all employers from 16 different states (the "Affected States") that are required to carry workers compensation Insurance ("WC insurance"). In many states, the WC insurance market is comprised of two submarkets: (1) the voluntary market, which provides coverage for companies able to purchase WC insurance in the open market; and (2) a residual (assigned risk) market for hirer risk companies unable to purchase WC insurance in the open market. Insurers that participate in the voluntary market are required by law to also participate in the residual market. Through certain state or industry-run pooling arrangements, some of the cost of providing insurance to the residual market is allocated to the voluntary market to ensure that employers can obtain assigned risk coverage if necessary. This system is predicated on the voluntary market insurers truthfully reporting their WC premiums to state insurance regulators and/or industry pools, so that the regulators and pools can allocate the costs of the residual market and pass the costs on to voluntary market insurers.[2]

Some states, including each of the Affected States, administer certain Special Purpose Funds ("SPFs") such as guaranty funds, fraud investigation funds, and second or subsequent

---

[2]A more detailed explanation of the WC insurance market and AIG's alleged fraud can be found in this court's opinions in National Council on Compensation Ins. Inc., ("NCCI") v. AIG, 2007 WL 7715103 (N.D. Ill. 2007); NCCI, Inc. v. AIG, 2007 WL 771 (N.D. Ill. 2007); NCCI, Inc. v. AIG, Inc., 2009 WL 466802 (N.D. Ill. 2009).

injury funds. In the Affected States, some or all of the costs of administering these funds are paid by the employers who purchase WC insurance as a surcharge billed to the policyholders by the insurer and then passed on to the state. Each state's insurance regulators aggregate the WC insurers' premium data to determine the total amount of WC insurance written in that state for a given year. The regulators determine the amount of money needed to fund the SPFs, then calculate what percentage of the aggregate WC insurance written that amount equals. The regulators then instruct the insurers to add a surcharge to each policyholder (including plaintiffs) equal to that percentage of the policyholder's premium. This ensures that each policyholder pays its pro-rata share of the costs of maintaining the SPFs.

If an insurer provides inaccurate information as to the amount of WC insurance premiums it writes in a given state, the state's calculations are skewed. If, as plaintiff's allege of AIG, the insurer underreports the amount of WC insurance it writes, then the percentage of the total premiums reported needed to fund the SPFs will be higher (because the total amount of money necessary remains the same), thereby increasing the percentage of each policyholders' premium it pays as a surcharge.

For example, if a state has an SPF that requires $1 million to operate, and the aggregate premium written in the state in the previous year was $100 million, the state would institute a 1% surcharge assessed against each policyholder. Each policyholder would pay a surcharge of 1% of its WC insurance premium for that SPF. If an insurer underreported the amount of WC insurance premiums it wrote in the state by $25 million, the state would still need the $1 million to operate the fund, but believing that only $75 million was the aggregate premium written in the

state, it would impose a surcharge of 1.3% instead of 1%. As a result, each policyholder would pay an inflated surcharge.

According to plaintiffs, beginning as early as 1970, AIG devised, implemented, participated in and carried out a number of nationwide schemes to "miss-catagorize, falsely report, and falsely book" its WC premiums as other premiums (for example general liability premiums), to reduce its expenses, inflate its profits, and unjustly enrich itself at the expense of plaintiffs. By issuing false certified annual financial reports that underreported the WC insurance premium figures, AIG evaded paying its equitable share of financial responsibility for state-levied taxes and assessments.

AIG's alleged underreporting caused the Affected States to miss-calculate the percentage surcharges needed to administer the SPFs, causing plaintiffs (and all WC insurance policyholders whether insured by AIG or other insurers) to pay artificially inflated amounts to fund the SPFs. As plaintiffs allege in ¶ 63 of the CAC, "[e]ach Affected State's miscalculations were the intended, foreseeable and, natural consequences of Defendants' fraud."

AIG accomplished this fraud and concealed its actions from state regulators, other insurers and policyholders, by keeping at least two separate sets of books. It kept an accurate set that tracked the amount of WC insurance premiums it collected from its policyholders and the actual amount of state mandated surcharges it collected from its policyholders. It also kept a second set of books that tracked inaccurate lesser amounts of WC insurance premiums that it reported to state regulators and the inaccurate lesser amount of state mandated surcharges that it collected from its policyholders and then remitted to the state. Only the false set of records was made available to state auditors.

4

By remitting to the state only the surcharges that the state expected based on the inaccurate underreported premiums, AIG was able to retain the difference from the amount it collected from all the WC insurance policyholders and the lower amount remitted. Thus, AIG's fraudulent underreporting of WC Insurance premiums allowed it both to evade state premium taxes it would have otherwise owed, and to profit unlawfully from the state mandated surcharges.

## **DISCUSSION**

Defendants have moved to dismiss the entire CAC under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, arguing that each of the claims are barred by the applicable statute of limitations.[3] A motion under Rule 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990). The court accepts the well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. McMillan v. Collection Professionals Inc., 455 F.3d 754, 758 (7th Cir. 2006). To state a claim, a complaint must allege facts that, if true, would raise a right to relief above the speculative level showing that the claim was plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). To be plausible on its face the complaint must plead facts sufficient for the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Ashcroft v. Iqbal, 556 U.S. 622, 678 (2009).[4]

---

[3] The RICO claims are subject to a four year statute of limitations. Rotella v. Wood, 528 U.S. 549, 552-53 (2000). The parties appear to agree that plaintiffs' remaining claims are subject to one- to six-year limitation periods. The first of the cases consolidated in this multi-district litigation was filed on October 8, 2013.

[4] In deciding a Rule 12(b)(6) motion the court may also consider documents attached to
(continued...)

The statute of limitations is an affirmative defense to liability that ordinarily must be pleaded and proved by the defendant. Fed. R. Civ. P. 8(c)(1); Jay E. Hayden Foundation v. First Neighbor Bank, N.A., 610 F.3d 382, 383 (7th Cir. 2010). "Complaints need not anticipate defenses and attempt to defeat them." Richards v. Mitcheff, 696 F.3d 635, 637 (7th Cir. 2012). As a result, the Seventh Circuit has often held that Rule 12(b)(6) is not designed for motions under Rule 8(c)(1). Id. (and cases cited therein). Nonetheless, "if it is plain from the complaint that the [statute of limitations] defense is indeed a bar to the suit dismissal is proper without further pleading." Jay E. Hayden, 610 F.3d at 383. The dismissal should be on the pleadings under Rule 12(c), but that amounts "to the same thing as a dismissal under Rule 12(b)(6)." Richards, 696 F.3d at 637.

In the instant case, plaintiffs have in fact attempted to defeat the limitations defense in the CAC, by extensively detailing AIG's efforts to conceal its fraud. The question thus becomes whether they have succeeded, or whether the detail provided simply demonstrates that their complaint is untimely and that they have pled themselves out of court.

**RICO**

RICO actions are governed by a four year statute of limitations. Jay E. Hayden, 610 F.3d at 383; Rotella v. Wood, 528 U.S. at 552-53. The limitations period begins to run when the plaintiff discovers (or if diligent should have discovered) both the injury that gives rise to its claim and the injurer. Jay E. Haden, 610 F.3d at 386. The focus is on the discovery of the harm

---

[4](...continued)
the complaint, which, under Fed. R. Civ. P. 10(c), become part of the pleadings, and all other matters of which it might take judicial notice. Geinosky v. City of Chicago, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

6

itself, not the discovery of the elements that make up a claim. Cancer Foundation, Inc. v. Cerberus Capital Mgmt., LP, 559 F.3d 671, 674 (7th Cir. 2009). Thus, the plaintiff need not know that the injury is actionable to trigger the statute of limitations. Id.

Additionally, it is "the injury arising from the first predicate act to injure the plaintiff (predicate acts are the illegal acts committed by the racketeering enterprise) [that] starts the limitations period running, rather than the injury from the last predicate act, which might occur decades after the first." Jay E. Hayden, 610 F.3d at 386-87. Thus, a plaintiff need not know that he has been injured by a RICO violation (a pattern of racketeering activity), because the scope and nature of his legal claims are what he has four years to discover. Id. at 387.

In the instant case, plaintiffs' CAC contains great detail about the length and breadth of AIG's fraud. Indeed, it contains almost 70 pages of allegations detailing AIG's fraud overall and in each of the Affected States. The complaint also contains great detail about how and when AIG's fraud came to light and the publicity surrounding its discovery, including publicity surrounding the New York Attorney General's suit against AIG in 2005, accusing it of underreporting. The CAC also alleges that the National Council on Compensation Insurance Inc. ("NCCI"), on behalf of participating companies in the National Workers' Compensation Reinsurance Pool ("NWCRP"), sued AIG in this court alleging that AIG's underreporting of WC insurance premiums caused other insurers to incur a disproportionate share of the losses and assessments associated with the assigned risk (residual) pool in states that participated in the NWCRP. See NCCI, Inc. v. AIG, Inc., 2007 WL 7715103.

The publicity surrounding the New York authorities' investigation of AIG's underreporting was both extensive and national. As the CAC details, the impetus for the

7

investigation was a January 31, 1992, internal memorandum to Greenberg by AIG's then General-Counsel Michael Joye (the "Joye Memorandum"), which alleged that AIG had knowingly underreported the volume of its WC premiums. The Joye Memorandum was cited and quoted extensively in the press as early as April 2005. For example, an April 27, 2005, New York Times Article titled Workers' Comp Accounting Studied at A.I.G. identified the Joye Memorandum and stated that "[i]n 1992 an employee wrote a memo stating the practice was illegal and that the 'unlawful benefit' to A.I.G. was in the tens of millions." That same day the Wall Street Journal ran a similar article titled Top AIG Lawyer in 1992 Warned on Accounting. That article, again referencing the Joye Memorandum, noted that Joye had said that AIG's reporting of workers' compensation premiums is "permeated with illegality."

On May 26, 2005, the State of New York filed suit against AIG alleging the underreporting. The Joye Memorandum was attached to the complaint and was publicly available on the New York Attorney General's website at http://www.ag.ny.gov/press-release/state-suit-cites-pattern-fraud-AIG. Two days later, May 27, 2005, both the New York Times and the USA Today published articles about the lawsuit and its allegations based on the Joye Memorandum and Joye's interview notes. AIG's memorandum in support of its motion details the plethora of national articles published about AIG's alleged fraud, the existence and contents of which plaintiffs do not contest and of which the court takes judicial notice.

It is the existence of these articles, all of which clearly detail the New York Attorney General's investigation, lawsuit and ultimate settlement with AIG, and the CAC's detail regarding the fraud that distinguish the instant case from Sidney Hillman Health Center of Rochester v. Abbot Laboratories, Inc., __F.3d __, 2015 WL 1621401 (7th Cir. April 15, 2015).

In Sidney Hillman, the Seventh Circuit reversed a district court's dismissal of a RICO complaint based on statute of limitation grounds, concluding that the defendant's assertion that the plaintiffs had the duty and sophistication to monitor their payments of off-label prescriptions and realtime "was not clear from the complaint," and that the news articles cited by the defendant "presented conflicting information," leaving the court with "insufficient information to decide when a reasonable third-party purchaser should have discovered that it had paid more for off-label uses than it otherwise would have had to because of an illegal marketing scheme." Id. at *5, 6.

In contrast, the detailed allegations in the instant CAC leave no doubt that plaintiffs should have known of their injuries by at least 2005. They expressly allege that their injuries are the "foreseeable and natural consequence" of AIG's underreporting of its WC insurance premiums, which was widely publicized in 2005 and 2006. Nor is there any conflicting information in any of the articles cited by AIG, which detailed the specific allegations of AIG's decades-long fraud.

In light of the vast amount of publicity about AIG's fraud in 2005, plaintiffs also exert great effort alleging how prior to 2013 they did not know and could not have discovered that they had been injured. Their efforts in this regard are primarily twofold. First, they point out that none of the news articles or publicity surrounding AIG's fraud, and none of the numerous lawsuits against AIG, ever specifically mentioned how policyholders, and in particular, non-AIG policyholders, were injured. Nor did any of those articles or lawsuits specifically mention SPFs.

Next, they argue and allege how difficult it was (and is) for plaintiffs to have understood how they were injured because each state's method of calculating the required amount of SPF

9

funds, and thus the percentage of premiums charged to each policyholder, was so complicated. It is undisputed that plaintiffs' invoices simply listed the surcharge, without any explanation of how the charge was calculated. Thus, plaintiffs allege and argue, the invoices did not contain any information from which a reasonably diligent insured should have discovered that the SPF charges had been inflated by AIG's underreporting of WC insurance premiums.

As AIG points out, however, by 2006 at the latest plaintiffs had all the information they needed to discover their injury. They were aware, or should have been aware, as early as 2005 that AIG was underreporting the amounts of WC insurance premiums it was writing. They were aware through the detailed WC invoices they received that they were paying SPF surcharges, and they were aware, or should have been aware, that these surcharges were based by reference to the total amount of WC insurance premium reported to state insurance regulators. And, as AIG also points out, the method of calculating the SPF percentage was published either in state statutes or regulations of which plaintiffs were on notice. See Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 610 (7th Cir. 1995) ("In today's society, with the advent of the information superhighway, federal and state legislation and regulations . . . are easily accessed."). Plaintiffs are "presumed to have information available in the public domain" and are "imputed with constructive knowledge of this information." Id.

Thus, all plaintiffs' CAC alleges is that they were ignorant as to how the SPF charges they were paying were calculated, and had never bothered to inquire about the charges even after learning of AIG's massive fraud. Indeed, the complaint fails to allege any new information that has come to light since 2005 that somehow alerted plaintiffs to their injuries. A RICO plaintiff must "both use due diligence to discover that he has been injured and by whom even if the

10

defendant is engaged in fraudulent concealment, and diligently endeavor to sue within the statutory limitations period or as soon thereafter as feasible." Jay E. Hayden, 610 F.3d at 388. Plaintiffs have done neither.

What the CAC does allege, and what plaintiffs' entire argument boils down to, is that they were unaware of and could not have discovered their injuries until they were approached and told of their injuries by a group of class-action attorneys, who themselves had been advised by an expert with specialized knowledge of the WC insurance industry. "Only because of this specialized knowledge was plaintiffs' counsel able to determine that plaintiffs and the Class had been harmed by Defendants' conduct." (Complaint, ¶289; Plaintiffs' brief p. 14).

Plaintiffs supply no support, however, for the proposition that the statute of limitations period does not begin to run until a lawyer explains to a plaintiff how it might have been injured. There is good reason for this lack of support. It is not the law. See, e.g. Salois v. Dime Savings Bank of N.W. FBS, 128 F.3d 20, 26 (1st Cir. 1997) ("It was attorney consultation, rather than newly-discovered information, that prompted plaintiffs' lawsuit. Therefore, sufficient facts – indeed all the facts were available to place plaintiffs on inquiry notice of fraudulent conduct. Moreover, even if we regard plaintiffs' consultation with an attorney as 'discovered' information . . ., it cannot be said that plaintiffs were reasonable in waiting until 1994 to consult an attorney . . ..").

As the court noted in Riddle v. Bank of America Corp., 2013 WL 6061363, *7 (E.D. Pa. 2013):

> Plaintiffs' argument fails, because it renders the statute of limitations a nullity. Plaintiffs' theory would provide them with an unlimited time to resuscitate stale claims and would leave the Court with no way to determine when the clock begins to run on their claims. Under Plaintiffs' theory, when would the statute of

limitations run?  One year after Plaintiffs received their first solicitation letter?  One year after Plaintiffs first met with lawyers to discuss their claims?  Is there a point in time in which Plaintiffs had to seek advice of counsel, rather than having counsel approach them.

Despite plaintiffs' creative pleading, or perhaps because of it, there can be no doubt that all of the information relied on by the attorneys and their specialist to determine that plaintiffs had been injured was available and common knowledge as far back as 2005.  Indeed, the complaint fails to allege that the lawyer**s** or specialist relied on any "new" information that was unavailable in 2005 when determining that plaintiffs had a claim.  There is simply no valid reason for waiting until 2013 to file the first of these consolidated suits other than to wait until AIG had settled all of its previously filed fraud-related actions.  Whatever the reason, plaintiffs' RICO claims are barred by the statute of limitations.

**State Claims**

Plaintiffs have brought a number of state law claims.  The parties agree that none of the claims have statute of limitations periods greater than six years.  Thus, even applying the discovery rule to all of these claims, the court's conclusion that plaintiffs should have discovered their injury by 2005 renders them all barred by their applicable statutes of limitations.

**CONCLUSION**

For the reasons described above defendants' motions to dismiss (Doc. 14, 18) are granted.

**ENTER:** April 27, 2015

_____
**Robert W. Gettleman**
**United States District Judge**